Newman v. Kirk.

## George C. Newman

*v.*

## Walter Kirk et al.

1. A conveyance of land by a debtor held to be fraudulent and void as against a creditor, whose debt was subsequently put in judgment, upon the following badges of fraud : *First*, the consideration was a debt previously discharged by decree in bankruptcy ; *second*, its amount was overstated in the deed and was grossly inadequate, as compared with the value of the property conveyed ; *third*, the encumbrances on the property were overstated in the conveyance; *fourth*, the conveyance was to the grantor's mother-in-law, an aged and infirm person, an inmate of his family, and was made with the understanding that she would ultimately convey it to the grantor's wife, which she did ; *fifth*, the grantor took from the grantee a power of attorney by which he retained full control of the property and derived all the benefit from it.

2. The fraudulent grantor, acting as agent of the fraudulent grantee, permitted a lien claim against the property to go to judgment, execution and sale by the sheriff, and purchased the property in the name of the fraudulent grantee and paid for it with her money. The amount of the claim was less than two per cent. of the whole value of the property. This was done in order to gain an advantage over a party who held a bond and mortgage upon the premises,

upon which only a portion of the money mentioned in it had been advanced.—
*Held*, that the assignee of the purchaser at sheriff's sale might hold the title
acquired from the sheriff as security for the amount actually paid to the
sheriff.

On bill, answers and proofs.

*Mr. A. Stephany*, for the complainant.

*Mr. Joseph Thompson*, for the defendants.

PITNEY, V. C.

The bill is by a judgment creditor against the judgment debtor
and his grantee of certain lands, asking that the conveyance may
be declared fraudulent and void as against complainant's judg-
ment.

The judgment was recovered January 23d, 1883, and appears
by the declaration to have been founded upon an indebtedness
on the common counts, as of January, 1882. The bill alleges
that it was based upon a debt or debts existing in October, 1881.
This is admitted by the answer of the judgment debtor, Walter
Kirk, but not in the answer of his grantee, Annastena Kirk, his
wife. It was, however, proven at the hearing.

The judgment debtor acquired title to the premises in dispute
December 22d, 1880, and, by deed dated November 17th, 1881,
conveyed them to his mother-in-law, a Mrs. Harriet Hammond,
who, in January, 1884, conveyed them to Mrs. Annastena Kirk,
the wife of Walter. This last conveyance was declared to be
for the consideration of one dollar and of love and affection.
These conveyances are the object of complainant's attack.

The property in question is a hotel, known as the "Stockton
House," at Atlantic City, situate on the corner of Atlantic and
Maryland avenues, with a frontage on Atlantic avenue of one
hundred and seven feet, and a depth on Maryland avenue of one
hundred and fifty feet. The deed from Kirk to Mrs. Hammond
covered the hotel property and also a block of land bounded by
Arctic, Baltic, Rhode Island and Vermont avenues. The con-
sideration mentioned in the deed is "$11,871 as hereafter men-

tioned," and, after the description of the premises, is stated thus :

"This conveyance is in full payment and discharge of a certain indebtedness of eleven thousand eight hundred and seventy-one dollars due and owing by the said Walter Kirk as Administrator of the estate of John A. Hammond, deceased, late of the County of Philadelphia, to said Harriet Hammond in her own right, and as assignee of Joseph T. Hammond and said Annastena Kirk, awarded by the Orphans Court of said County to be paid to them upon an audit and adjudication of the accounts of said Walter Kirk, as by reference to said proceedings the same will more fully and at large appear."

An examination of the proceedings in the Philadelphia orphans court shows that, by a decree dated April 24th, 1875, Walter Kirk, one of the administrators of the estate of John A. Hammond, deceased, was found to be indebted—

To Mrs. Hammond, the widow of the decedent, in the sum of........ $2,764 80
To Joseph T. Hammond, the son of decedent, in the sum
  of............................................... ...................... $2,516 69
Less cash in Joseph T. Hammond's hands.....................   795 73
                          —————— 1,720 96
To Annastena Kirk, daughter of decedent, and wife of Walter........ 4,723 33

                                       $9,209 09

Just how this sum was developed into the sum of $11,871, mentioned as consideration in the deed, does not appear in either of the answers, and no attempt was made at the hearing to show it, either by evidence of witnesses or explanation of counsel.

Mrs. Kirk, in her answer, contents herself with saying :

"That she was always informed by the parties and verily believes that such conveyance was good and valid in law, and made for *bona fide* consideration expressed therein."

No proof was made that any assignment had ever been made to Mrs. Hammond by either Joseph T. Hammond or Mrs. Kirk of his or her share in their father's estate, and in 1878, as will appear further on, Walter Kirk treated the decree in favor of his brother-in-law as being paid.

Walter Kirk, in his answer, drawn by the same solicitor as was his wife's, gives his account of the consideration thus:

"The said Eleven Thousand Eight Hundred and Seventy-One Dollars above referred to as part of the consideration consists of the following amounts, and of money due and owing from this defendant to Harriet Hammond, and the said Harriet Hammond assuming the payment of certain bills, then and there a lien upon the said premises, viz."

I tabulate what immediately follows, thus:

| | | |
|---|---:|---:|
| Due Mrs. Hammond from Walter Kirk on decree in orphans court of Philadelphia | $2,764 | 80 |
| Due Edwin A. Smith and William R. Smith, for materials furnished in enlarging the Stockton House | 415 | 49 |
| Due Mary Dissten and others, for materials furnished in enlarging the Stockton House | 381 | 49 |
| Due George F. Currie, for materials furnished in enlarging the Stockton House | 1,651 | 07 |
| Due George F. Currie and Samuel Faith, for materials furnished in enlarging the Stockton House | 856 | 76 |
| Due William A. French, for materials furnished in enlarging the Stockton House | 311 | 13 |
| Due Josiah Bryan, for materials furnished in enlarging the Stockton House | 3,500 | 00 |
| | $9,880 | 74 |

"And," continues the answer, "the balance of said sum of eleven thousand eight hundred and seventy-one dollars, being the sum of money mentioned as the consideration in the deed made by this defendant and wife to said Harriet Hammond, was interest due and owing upon said mortgages and taxes due and unpaid on said premises."

Just how the interest upon these various sums and the taxes made up the difference between their aggregate and $11,871, the consideration expressed in the deed, no attempt was made to show. No statement or calculation showing it was presented.

This extract from the answer, contrasted with the above extract from the deed, shows that the statement of the consideration in the deed was knowingly untrue, and it is fair to infer that it was put in odd dollars in order to give it an air of reality.

And yet, in the face of this statement found in his answer, Kirk swears on the witness-stand " that the $11,871 was for moneys he owed the estate of John A. Hammond as administrator."

The proofs show that the claim for materials furnished by Josiah Bryan, mentioned in the answer and put at $3,500, was secured by and included in the mortgage to him, which was on the premises at the date of the conveyance, and was by its terms assumed by the grantee and is still a lien upon the premises.

With regard to the other claims last above recited, all but one (William A. French's) were paid by the sale of the one-half of the Baltic avenue block included in the same conveyance. French's claim was put in suit, and went to judgment February 12th, 1883, and the premises were subsequently sold under it and purchased by Mrs. Hammond. The object of Kirk in permitting this claim to go to judgment and sale appears further on.

No change occurred in the occupancy and management of the house after the conveyance of November 17th, 1881. Mrs. Hammond was eighty years old and very decrepit. She had been an inmate of Kirk's family for several years, and continued to live with him until she died. At the date of the deed she executed to Kirk a power of attorney to manage the hotel in her name. The document itself is not produced, and its contents were not proven with any degree of certainty. It does not appear that any contract was made between Kirk and his mother-in-law as to what compensation he should have for his services in managing the business. He did not pretend that any such contract was made. He took from the income of the house what he needed for his own purposes. It does not appear that he ever rendered Mrs. Hammond any account of his dealings with the property. On the contrary, he kept the ordinary books of a hotel, precisely the same, so far as appears, as if it had been kept in his own name; but he says Mrs. Hammond could and did look them over. This is all the accounting he ever made to her. He deposited the money taken in from the hotel in her name in bank, and, under the power of attorney, drew against it to pay expenses and so forth; but it does not appear that he ever paid her any of it.

Shortly before Mrs. Hammond died she executed and delivered a deed of conveyance to her daughter, Annastena Kirk, and after that the business continued as before to be carried on by the husband. It is apparent that he did at all times have complete control of it.

At the time of the conveyance to Mrs. Hammond the property in dispute was encumbered by three mortgages, two held by the late James B. Dayton for $5,000 and $1,500 respectively, and one by Josiah Bryan for $15,000. This latter mortgage was given to secure Mr. Bryan for money to be advanced by him to pay off the Dayton mortgages, and for materials to be furnished and used in building an addition to the house. At the date of the conveyance Bryan had not paid Mr. Dayton, and had advanced in materials from $2,500 to $3,500 only, which I find from the evidence is the very $3,500 mentioned in the foregoing statement taken from Walter Kirk's answer. Thus it appears that the actual mortgage encumbrance on the hotel was $10,000.

In the deed is this clause :

"Under and subject as to premises No. 1 [The Stockton House] to the lien of three certain mortgages charged thereon, one for five thousand dollars and one for fifteen hundred dollars and the third for fifteen thousand dollars, with interest thereon respectively, the mortgages for five thousand and fifteen hundred dollars, in all, six thousand five hundred dollars, the said Walter Kirk promises and agrees to pay off and satisfy and have discharged so that the said premises shall be and remain subject only to said mortgage for fifteen thousand dollars. And as to premises No. 2 [Baltic avenue lot] under and subject to the lien of two certain mortgages, debts of thirty-five hundred and one thousand dollars respectively charged thereon, besides interest."

The evidence shows that what Kirk expected and intended to do in execution of that covenant, was, not to pay any money, but to compel Bryan to fulfill his agreement to pay off Dayton. This undertaking proved a difficult one, Mr. Bryan objecting, for some reason, either to pay Dayton or to put the proper credit on his mortgage. And in order to compel him to do what was right in that behalf, Kirk resorted to the following expedient: instead of paying all the persons who held lien claims against the house, as set forth in his answer, he permitted one of them,

William A. French, to sue and take judgment on his claim, and to issue execution and sell the property. As the lien claim over-reached the Bryan mortgage, the purchaser would acquire a title superior to that mortgage. At the sale under the lien claim judgment, Mrs. Hammond became the purchaser. Kirk swears positively that she furnished the money to pay the sheriff for his deed out of her own individual funds, and not out of the proceeds of the house or from the proceeds of any of the lands conveyed to her by him. Although the evidence of this witness was not given in such a manner, and his appearance and behavior on the stand were not such as to inspire me with any great degree of confidence in his reliability as a witness, I shall assume his statement in this respect to be true, and proceed on the basis of Mrs. Hammond having actually advanced from her own funds the money to pay the French judgment.

So much for the consideration and encumbrances.

Let us now proceed to consider the value of the property conveyed at the date of the conveyance. Kirk purchased the hotel property about January 1st, 1880, at the price of $8,500. At that date it was in bad repair, and was subject to a nuisance from a hotel on the same side of Atlantic avenue, and separated from it by Maryland avenue, which Kirk had private information would be removed the following season; and in the summer of 1881 this nuisance was removed, and also a new line of railroad was built from Philadelphia to Atlantic City, and a considerable boom in real estate occurred there at that time. Kirk expended $7,200 in repairs and additions to the building, and altogether a decided increase in its market value took place before the conveyance to Mrs. Hammond.

Senator Gardner and Mr. Irving, two experienced local real estate dealers, estimated it at $33,500 or thereabouts. Their evidence was not contradicted except, inferentially, by the price at which the property was sold by Kirk the previous year. I think that these witnesses included in their estimates some improvements (a new kitchen) put on it a year or two later—in 1883 or 1884—and which Kirk stated cost $2,500, and, making allowance for that, I judge the property was worth from $25,000 to

$30,000 in November, 1881, and it was subject to mortgages upon which only $10,000 had been actually advanced, namely, $6,500 by James B. Dayton and $3,500 by Josiah Bryan, and to lien claims amounting to $3,812.19, as taken from Kirk's answer, in all less than $14,000.

Then we have the Baltic avenue block, which Kirk tells us cost $7,000, and was mortgaged for $4,500, and which must have been worth more than $7,000, since a year or two later Kirk used the one-half of it, subject to one-half the mortgages, to pay all the lien claims except French's. The written statement of that transaction is made an exhibit by consent, and shows that the one-half was conveyed upon an estimated value of $6,477.68, and the items contained in that statement verify the details of the lien claims stated in Kirk's answer. From all this I judge that the equity in the Baltic avenue block was worth, in November, 1881, at least $5,000, and made the value of the equity in both lots conveyed from $16,000 to $20,000, while the actual consideration for the conveyance was the amount due or claimed to be due from Kirk to Mrs. Hammond on the Philadelphia decree, about $2,800, and if we add the amount due his wife at $5,000 we have the whole about $8,000. At the same time the furniture in the house, which cost about $7,000, and part of which was the basis of complainant's debt, was transferred to Mrs. Hammond. Kirk swears she did pay some of the parties who held unpaid bills for it. But how, or when, does not appear, and his evidence on that point is unsatisfactory. I think it fairly inferable from all the circumstances and evidence that, whatever was paid on account of the furniture either came from the earnings of the house or from further advances, either from Mr. Bryan or Mr. Dayton, upon the mortgages on the real estate, or from the sale of the remaining one-half of the Baltic avenue block. I am not satisfied from the evidence that Mrs. Hammond ever advanced any of her own money towards either the land or furniture, unless it be what was paid to the sheriff for the title under the French lien judgment.

It does not appear that Kirk had any other property at that time, except the real estate so conveyed to Mrs. Hammond and

Newman *v.* Kirk.

the furniture in the house; and I am satisfied that he did convey to her all the property he had standing in his own name.

Now, with regard to the decree in favor of Mrs. Hammond. It was proven on the part of the complainant that, in the year 1875, Kirk was proceeded against by Mrs. Hammond and her son in the Philadelphia court by attachment, and was in the hands of the sheriff for several days, and that he was released by an arrangement by which one Mosher, who was a figure-head for Kirk in the ownership of certain real estate in Philadelphia, conveyed to Mrs. Hammond and her son, Joseph T. Hammond, a lot of real estate situate there, the deed for which is produced, and the consideration money mentioned therein is $7,500. And it was contended on the part of the complainant that such conveyance operated as a payment and satisfaction of the amount due Mrs. Hammond and Joseph T. Hammond. It was proven on the part of the defendants that the property so conveyed was heavily mortgaged, and that in the end it proved to be of no value whatever, and that it was not accepted by Mrs. Hammond and her son in payment, but only as a consideration for releasing Walter Kirk from imprisonment under the attachment proceedings. There is no pretence that any receipt or release was given to Walter Kirk on that occasion. All that his creditors did at that time was to release him from confinement under the attachment proceedings.

At the hearing I intimated that I should not treat the decree of Mrs. Hammond as being satisfied by what took place in that behalf, and I shall treat her decree as still an existing indebtedness, so far as the discharge from the custody of the sheriff in Philadelphia is concerned.

But complainant further shows that, in July, 1878, Walter Kirk petitioned the federal court in Philadelphia for his discharge from his indebtedness, under the bankruptcy laws of the United States, and that he was discharged therefrom in July, 1879. On the list of creditors annexed to his petition I find the name of his wife Annastena, the defendant herein, for $5,000, and Mrs. Harriet Hammond for $2,700. I do not find Joseph T. Hammond among those creditors. This omission of the brother

indicates that Kirk did not consider him as a creditor at that time, and the amount at which Mrs. Hammond's debt is set down, viz., $2,700, as against $2,764.80 in April, 1875, shows that her claim had not been increased by the assignment to her of Joseph T. Hammond's decree, nor by the accumulation of any interest, but rather decreased than otherwise. At the same time the decree in favor of Kirk's wife had increased from $4,723 to $5,000.

If, in November, 1881, Kirk did not owe Mrs. Hammond anything, then this conveyance was entirely without consideration.

But it is said that the debt, though discharged in law, was not discharged in morals, and that it formed a good consideration for a new promise, and that Kirk was entirely justified in paying her. But, in my judgment, the last of these propositions does not necessarily follow the first, and, admitting the first to be sound, does not carry the defendant far enough. The question is not whether the indebtedness, discharged by the decree in bankruptcy, would not form a sufficient consideration for a new promise to pay it, nor whether a debtor ought not in morals to pay it if he should subsequently become able to do so without doing injustice to others ; but the question is, whether a debtor, having procured his discharge from his old indebtedness and launched himself upon the business world, and obtained mercantile credit on the strength of his being free from indebtedness, can appropriate the property acquired by such credit, and for which he is still indebted, to the payment of a creditor whose debt was barred by such discharge, without first paying the new creditor, to whom he is indebted for the very property so appropriated. Admitting, for argument's sake, that he may do so, certainly all will agree that such a transaction, to say the least, does not commend itself to a court of equity, which would say to the debtor so situated and contemplating such a transaction, you should be *just* to your *new* creditors before you are *generous* to your *old* ones. And the party seeking to uphold such a transaction here must not expect the court to go farther in that direction than the strict rules of law require it to go.

Both the husband and wife swear that, at the time of the conveyance in question, there was no agreement on the part of the mother to convey the property to the wife; but immediately before so swearing, the wife, in answer to the question how her mother came to convey the property to her, said that her mother " *always* said she was going to do it." The force of the word " always " in that sentence cannot be mistaken. It must be understood as reaching back to the very date of the conveyance to Mrs. Hammond, and is very significant. To my mind it is impossible, in view of the whole circumstances, to doubt that Kirk conveyed the property to his mother-in-law in the confident expectation that in due time she would convey it to his wife. In the meantime, he retained and exercised absolute and complete control and management of it, and derived all the benefit which could be derived from it, and I believe that the whole affair was managed as it was for the purpose of giving him the control and the ultimate benefit of anything that could be saved out of the property, and I believe the mother-in-law was a willing party to this arrangement.

To recapitulate : we have, first, the untruthfulness of the statement of the consideration found in the deed, and the gross inadequacy of that proven. Secondly, the misleading character of the statement of the encumbrances, by which a person examining the record would be led to suppose that Mrs. Hammond took it subject to $21,500 of mortgages, with only the covenant of an insolvent grantor to reduce them by payments to $15,000, while in fact the evidence shows that the amount actually due upon them was only $10,000. Thirdly, the expectation that the grantee would sooner or later convey the property to the grantor's wife. Fourthly, the retention by the grantor of the complete control and management and of all benefit from the property.

These considerations seem to me to stamp the affair with fraud, and to bring it well within the decision of the court of appeals in the case of the *Hackensack Savings Bank* v. *Terhune, 18 Stew. Eq. 344.* The circumstances of this case are in many respects similar to those of the Hackensack Savings Bank. In that case Terhune was unquestionably indebted to his mother-in-law and

wife in a considerable sum of money. Their demand was meritorious. The discrepancy between the actual consideration and the value of the property conveyed in that case was not so great as in this, and it was free from several of the *indicia* of fraud found in this case. But there, as here, the debtor conveyed all his property in such a manner as to retain the control and management of it, and to secure to himself and family all benefit, if any, to be derived from it over and above the debt it was intended to secure. The conveyance was held void as against the creditor for that reason.

I therefore adjudge that the conveyance from Walter Kirk to Mrs. Hammond was fraudulent as against complainant as a creditor, and must be declared void as to him. The conveyance from Mrs. Hammond to Mrs. Kirk, being without consideration, falls with it.

It remains to deal with the title acquired by Mrs. Hammond from the sheriff of Atlantic county under the French judgment. I think that, under the circumstances, the utmost value which this court should put upon it, is to consider it as a lien upon the premises for the amount paid the sheriff, prior, of course, to complainant's judgment, and to give Mrs. Kirk the benefit of the position of an assignee of it. As she has been in possession through her husband, she will occupy the position of mortgagee in possession, and must account for the rents and profits, if complainant requires it.

I will advise a decree accordingly.